IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY R. BROWN, | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | CIVIL ACTION NO.: |
| | : | |
| NATIONAL PENN INSURANCE | : | 5:13-CV-01748-CDJ |
| SERVICES GROUP, INC., | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

**Judge C. Darnell Jones, II**                                        **August 22, 2014**

Pending before the Court is a motion for summary judgment, (Doc. No. 13), filed by

Defendant National Penn Insurance Services Group. After a thorough review of the record,

the Court will **GRANT** the motion and enter **SUMMARY JUDGMENT** on Counts I and II.

## BACKGROUND

This matter arises out of a series of incidents that occurred during the course of

Plaintiff Stacy Brown's ("Brown") employment at Defendant National Penn Insurance

Services Group, Inc., ("National Penn").[1] In December 2002, Brown began her employment

as a personal lines agent with First Service Insurance, ("First Service"), a predecessor to

National Penn. Def. SUF ¶1; Pl. Resp. SUF ¶1. When First Service became National Penn,

Brown continued her employment as a personal lines agent. Def. SUF ¶2; Pl. Resp. SUF ¶2.

During Brown's tenure of employment with National Penn, the company had three

separate "departments" or "lines": commercial, agricultural, and personal. Def. SUF ¶4; Pl.

---

[1] Paragraphs 13-28, 52, and 58 of Brown's statement of undisputed facts consist of evidentiary objections, not responses to defendant's factual statements. Pl. Resp. SUF ¶¶13-28, 52, 58. Because the Court will overrule these objections, (*see infra* pp. 8-10), and plaintiff does not admit or deny these facts, they will be deemed admitted for purposes of the present motion. Fed. R. Civ. P. 56(c)(3).

Resp. SUF ¶4. Brown was assigned to the "personal lines department," which handled automobile insurance, homeowners insurance, life insurance, and personal umbrella insurance. Def. SUF ¶5; Pl. Resp. SUF ¶5. As a personal lines agent, she was responsible for customer service and sales for the customers assigned to her. Def. SUF ¶6; Pl. Resp. SUF ¶6. Prior to December 2008, Brown worked in a private office, while the other personal lines agents shared larger offices with one other employee. Def. SUF ¶21.

**Personal Lines Department Reorganization**

In November 2008, Brown's immediate supervisor – Maryanne Broemel ("Broemel") – announced a reorganization plan for the personal lines department during an office meeting. Def. SUF ¶12; Pl. Resp. SUF ¶12. The reorganization was implemented "in an effort to maximize customer service and to better recognize the individual strengths and weaknesses of the personal lines agents." Def. SUF ¶¶13-14. It divided the personal lines agents into three groups: the Account Manager Group, the Processing Unit, and the Private Client Group. Def. SUF ¶15. The Account Manager Group was responsible for customer service issues; the Processing Unit was responsible for the file processing, auditing, and billing functions; and the Private Client Group was responsible for National Penn's VIP and bank referral clients. Def. SUF ¶16. Six personal lines agents – including Brown – were assigned to the Account Manager Group, three were assigned to the Processing Unit, and one was assigned to the Private Client Group. Def. SUF ¶17. Broemel chose Brown for the Account Manager Group "largely because she was perceived . . . to have strong customer service skills and was good at interacting with customers on the telephone." Def. SUF ¶20.

John Bachman, a male employee, was assigned to the Private Client Group.[2] Def. SUF ¶¶27-28.

The reorganization placed all account managers into teams of two and assigned each team to a separate office to reduce the likelihood that customers would be directed to voicemail. Def. SUF ¶18. As such, Brown was removed from her private office and placed in a new office with her account-manager teammate. Def. SUF ¶22.  Her work responsibilities changed in one regard: she was removed from "processing functions (e.g., completing paperwork, inputting information into the computers, auditing, follow-up with clients regarding necessary documents or other information, etc.)." Def. SUF ¶23. These changes were implemented for all account managers to enhance their focus on customer service. Def. SUF ¶24.  Furthermore, the "larger clients" were transferred to the Private Client Group, but neither party defined the term "larger clients" nor identified how many of Brown's clients were transferred. Def. SUF ¶31. None of these changes affected Brown's salary or benefits. Def. SUF ¶30; Pl. SUF ¶30.

Brown first learned of the reorganization during the November 2008 department meeting and claims she was "blindsided," "embarrassed," and "publicly humiliated" when she found out that "her accounts would be taken from her, and [that] John was taking over her personal office space." Def. SUF ¶34; Pl. Resp. SUF ¶¶12, 34. She requested a private meeting with Broemel to discuss the reorganization, specifically her assignment to a new office and Bachman's appointment to the Private Client Group. Def. SUF ¶35; Pl. Resp. SUF ¶35. Brown alleges that Broemel told her in the meeting that National Penn believed its larger clients would be happier doing business with a male agent and that this was the

---

[2] The position was initially offered to and turned down by Vickie Markley, a female employee. Def. SUF ¶¶26-27.

reason management had selected Bachman to head the Private Client Group. Brown Dep. 95:22-96:4. Broemel flatly denies making such a statement. Broemel Dep. 34:5-9. Brown claims to have told Broemel that she felt blindsided, embarrassed, and humiliated in front of her coworkers. Pl. Resp. SUF ¶60; Brown Dep. 94:18-22.

### David Ferrier Insurance Claim

Backtracking to 2004, Brown hired David Ferrier ("Ferrier") – a National Penn customer – to perform personal construction services, the commission of which resulted in damage to her home. Def. SUF ¶¶38-39; Pl. Resp. SUF ¶¶38-39. After giving Ferrier several opportunities to repair the damage, Brown decided to file an insurance claim with National Penn. Def. SUF ¶39; Pl. SUF ¶39. Brown approached Broemel about "putting a claim in" for the damage done by Ferrier to determine if personally handling the matter would "jeopardize her job." Def. SUF ¶42; Pl. SUF ¶42. Broemel apparently responded, "why would it jeopardize your job?" Pl. SUF ¶42. Brown testified that she did not tell Broemel that she would be accessing Ferrier's account information or entering the claim on her own behalf. Def. SUF ¶43-44. Nonetheless, she argues that Broemel should have understood that, by asking to put a claim in against Ferrier, Brown intended to access Ferrier's account and enter the claim herself. Pl. SUF ¶43.[3]

After speaking to Broemel, Brown consulted with Rosemarie Green ("Green"), the commercial lines agent who handled Ferrier's account. Def. SUF ¶45; Pl. Resp. SUF ¶45.

---

[3] Plaintiff's deposition reads as follows:

| | |
|---|---|
| Q. | Did you tell her that you were going to fill out the Acord form yourself? |
| A. | I told her I was filling – I was going to file the claim and she knows filing means setting up an Acord form. |
| Q. | And you know exactly what she understands? |
| A. | She's in the insurance business. She should know. |

Brown Dep. 118:21-25; 119:1-4.

Green advised Brown to send Ferrier a letter with a description of the problem as well as a repair estimate and anticipated that Ferrier would call Green to "submit the claim." Green V.S. at 1. On November 14, 2008, Brown used her work account to "obtain[] Ferrier's information" and file an insurance claim for construction services performed on her house. Def. SUF ¶41; Pl. SUF ¶41.

### Ferrier Complaint / Brown's Termination

On or about December 16, 2008, Ferrier contacted National Penn to complain about Brown's claim, arguing that Brown had acted unethically by using the company computer system to pull his confidential information and file a claim without his knowledge. Def. SUF ¶45. He notified the company that he had filed a complaint against both Brown and the National Penn with the Pennsylvania Insurance Department. Def. SUF ¶49. Upon investigation of Ferrier's complaint, National Penn determined that Brown's conduct was a direct violation of the company's Code of Conduct and terminated her employment on December 18, 2008. Def. SUF ¶¶52, 58.

Brown testified that National Penn provided her a copy of the company's Code of Conduct in July 2004. Def. SUF ¶54. The Code of Conduct reads in relevant part:

Conflicts of Interest

No covered person shall pursue any personal interests which might conflict with, or appear to conflict with, the interests of any NPBC Entity[4] or which might influence, or appear to influence, his or her judgment in any matter involving any NPBC Entity.

. . .

Confidential Information

---

[4] The parties agree that National Penn is a financial service affiliate of National Penn Bancshares, Inc. (NPBC). Compl. ¶5; Answ. ¶5.

> No covered person shall use or disclose any confidential information obtained from any NPBC Entity except for the proper conduct of the business of that or another NPBC Entity

> . . .

> Self-Dealing, Business Opportunities

> No covered person shall engage in any "self-dealing" transaction. A "self-dealing" transaction would be one in which a covered person, acting for himself or herself and also on behalf of an NPBC Entity, seeks to consummate a transaction in which self-interest is opposed to duty. No covered person shall trade on his or her position with any NPBC Entity.

Def. SUF ¶53.

On July 1, 2004, Brown signed an "Acknowledgement," which read in relevant part:

> I acknowledge that I have received, read and understand the foregoing Code of Conduct. I am in compliance with the foregoing Code of Conduct and I will comply with it in the future.

> . . .

> I understand that any violation of this Code of Conduct will subject me to appropriate disciplinary action, which may include demotion or discharge.

Def. SUF ¶55.

Despite her signed acknowledgement, Brown insists that she never read the Code of Conduct and claims that Broemel instructed her to sign the acknowledgement knowing she had not read it. Pl. Resp. SUF ¶53. Brown maintains that the rule that she was charged with violating was not published in any handbook, known by any other employees, or posted anywhere, and that her actions were approved by her management. Brown Discharge

Questionnaire 7.  At the time of her termination, Brown was two weeks overdue to receive her annual performance review.[5]

### Discrimination / Retaliation Claims

Brown filed a complaint with this Court on April 3, 2013, alleging gender discrimination and retaliation. Compl. ¶17. In particular, she alleges that National Penn discriminated against her by stripping her of her clients and office and giving them to a male co-worker. *Id.* She also alleges that National Penn retaliated against her by firing her for complaining about the reallocation of clients and office space. *Id.* at ¶19. Brown avers that National Penn's conduct violated Title VII of the Civil Rights Act of 1964 ("Title VII"), (42 U.S.C. § 2000e, *et seq.* (1991)), as well as the Pennsylvania Human Relations Act ("PHRA"), (43 P.S. § 951, *et seq.* (1961)). *Id.* at ¶¶18-19, 22. National Penn denies these allegations, arguing that Brown's clients and office were reassigned purely for business reasons and that Brown was terminated solely because she violated company policy. Def. Mot. Summ. J. 17-18. Brown rebuts these justifications as pretext. Compl. ¶¶14, 19.

### <u>STANDARD OF REVIEW</u>

Under Fed. R. Civ. P. Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In order to defeat a motion for summary judgment, disputes must be both (1)

---

[5] The record indicates that Brown last received a performance review on December 3, 2007, as well as a subsequent three percent salary increase on December 10, 2007. Brown Performance Appraisal 1; Memorandum from Stephanie Schlegel, HRIS on Employee Salary Change Confirmation to Maryanne Broemel (Dec. 10, 2007). Brown was due to receive her next review on December 3, 2008. Brown Performance Appraisal 1.

material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. *Anderson*, 477 U.S. at 248. In reviewing a motion for summary judgment, the Court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Seigel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## **DISCUSSION**

As an initial matter, the Court must address an evidentiary dispute raised in the parties' briefs: Brown attacks the affidavit of Maryanne Broemel as improper under Fed. R. Civ. P. 56(c)(4).[6] Pl. Resp. Opp'n Summ. J. 3-4. Rule 56(c)(4) provides, "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge . . . ." Courts have interpreted this rule to strike affidavits made upon "information and belief" or a party's "understanding" of the facts. *Carey v. Beans*, 500 F.Supp. 580, 583 (E.D. Pa. 1980) ("statements prefaced by the phrases 'I believe' or 'upon information and belief' or those made upon an 'understanding' . . . are properly subject to a motion to strike.").

---

[6] This same objection is set forth in paragraphs 13-28, 50, 52, and 58 of Brown's response to National Penn's statement of undisputed facts. *See supra* note 1.

Broemel's affidavit reads in relevant part, "[t]he foregoing is true and correct to the best of my knowledge, *information and belief*." Broemel Aff. ¶41. (emphasis added). Brown's objections to the affidavit appear to be twofold: (1) the affidavit improperly states that it is based on "information and belief" and (2) the content of the statements themselves demonstrates that some of them were not based upon Broemel's personal knowledge. It is true, as plaintiff argues, that an affidavit must be based on personal knowledge. Nevertheless a party's failure to include proper language in an affidavit's declaration of personal knowledge – or conversely, the inclusion of improper language – does not invalidate the entire contents of an affidavit. *Keating v. Bucks C'nty Water & Sewer Auth.*, No. CIV.A. 99-1584, 2000 WL 1888770, at *4 (E.D. Pa. Mar. 1, 2001). Rather, the Court must only disregard statements that are clearly not based upon personal knowledge. *See id.*; *Carey*, 500 F.Supp. at 583-84. Broemel unequivocally states in both her affidavit and deposition that she was Brown's immediate supervisor, Vice President of the personal lines department, and the individual responsible for both the departmental reorganization and employee discipline. Broemel Aff. ¶¶3, 8; Broemel Dep. 8:3-21, 9:6-10:9. Therefore, the majority of the statements dealing with Brown's job responsibilities, the reorganization, and her termination appear to be based upon personal knowledge. That being said, the Court does find paragraphs 25-27, 29 and 40 to be beyond the scope of Broemel's personal knowledge and will accordingly strike them from the affidavit.[7] Having addressed this

---

[7] Broemel's statements in paragraphs 25-27 and 40 purport to speak on behalf of all National Penn employees, not just Broemel. For instance, Broemel states, "[a]t no time was Ms. Brown told by NPIA that she was demoted in conjunction with the December 2008 reorganization." Broemel Aff. ¶25. The information in paragraph 25 (that *no one* told Ms. Brown she was being demoted) does not appear to be within the realm of Broemel's personal knowledge. This concern is especially acute in this context because Broemel's affidavit states that it is based on information and belief in direct contradiction of Federal Rule 56(c)(4). Therefore these statements will be considered for the present motion only insofar as they are probative of what Broemel said to Brown. For example, paragraph 25 will be read as follows: "[a]t no time was Ms. Brown told

preliminary matter, the Court will now evaluate Brown's discrimination and retaliation claims.

### Discrimination Claims

Gender discrimination claims under Title VII and the PHRA are evaluated using the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006). Under *McDonnell Douglas*, the initial burden of proof rests upon the plaintiff to establish a prima facie case of discrimination. 411 U.S. at 802. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions*. Id.* "Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual . . . ." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). In the instant matter, National Penn moves for summary judgment on the grounds that Brown has failed to set forth a prima facie case for discrimination. Def. Mot. Summ. J. 13. This Court agrees.

To establish a prima facie case for gender discrimination under Title VII, Brown must show that: "(1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) members of the opposite sex were treated more favorably." *Burton v. Teleflex*, 707 F.3d 417, 426 (3d Cir. 2013). The

---

by *[Broemel]* that she was demoted in conjunction with the December 2008 reorganization," instead of "[a]t no time was Ms. Brown told by *NPIA* that she was demoted in conjunction with the December 2008 reorganization." The former is, by definition, based on personal knowledge, so it can properly be considered, regardless of the defective affidavit of personal knowledge. The same modification will be made to paragraphs 26, 27, and 40.

standard for setting forth a prima facie case under the PHRA is generally the same as Title VII. *Dici v. Commw. of Pa.*, 91 F.3d 542, 552 (3d Cir. 1996) ("Generally, the PHRA is applied in accordance with Title VII); *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005) ("except where there is something specifically different in its language requiring that it be treated differently").[8] "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). However, "[t]o establish a prima facie case at summary judgment, the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of the prima facie case." *Burton*, 707 F.3d at 426 (internal quotations omitted). National Penn argues that Brown has failed to establish elements three and four (adverse employment action and unfavorable treatment vis-à-vis members of the opposite sex). Def. Mot. Summ. J. 13-16.

Adverse employment action is defined as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State University*, 133 S.Ct. 2434, 2443 (2013) (internal quotations omitted). A job transfer may constitute an adverse employment action in some circumstances even if it does not result in lost pay or benefits. *Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994) (citing *Collins v. Illinois*, 830 F.2d 692, 702-04 (7th Cir. 1987)) (recognizing that job transfer can constitute adverse employment action under ADEA); *see Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 411-12 (3d Cir. 1999) (same under Title VII); *see also Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999) ("Although direct economic harm is an important

---

[8] The parties are in agreement that plaintiff's PHRA claim should be analyzed under the McDonnell Douglas framework, and the Court is unable to find anything in the language of the PHRA that would warrant a holding to the contrary.

indicator of a tangible adverse employment action, it is not the sine qua non."). When an alleged adverse employment action does not result in monetary damage, the focus shifts and the Court must evaluate whether "there is a reduction in other terms, conditions, or privileges of employment." *McGrenaghan v. St. Denis School*, 979 F.Supp. 323, 326 (E.D. Pa. 1997).

Brown alleges that she suffered adverse employment action when, as a result of the departmental reorganization, she was "stripped of her clients and office." Compl. ¶17. "Employment actions such as lateral transfers and changes of title or reporting relationships have generally been held not to constitute adverse employment actions." *Walker v. Centocor Ortho Biotech, Inc.*, 558 F.App'x 216, 219 (3d Cir. 2014) (citing *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 761 (1998)). *Langley v. Merck & Co., Inc.* provides one example where the Third Circuit refused to find adverse employment action in a job transfer. 186 F.App'x 258, 260 (3d Cir. 2006). In *Langley*, the plaintiff was reassigned as a result of a company-wide reorganization, and her title, responsibilities, reporting relationships, and office location were changed. *Id.* She filed suit against her company, arguing that the changes constituted adverse employment action, but the Third Circuit held, "[the fact] [t]hat [plaintiff's] title, office, reporting relationship and responsibilities may have changed is insufficient to make her reassignment an adverse employment action. An adverse employment action is one that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Id.*

Brown relies on *Durham Life Insurance Co. v. Evans*. Pl. Resp. Opp'n Summ. J. 13 (citing *Durham Life Ins. Co. v. Evans*, 166 F.3d 139 (3d Cir. 1999)). In *Durham*, the Third

Circuit found adverse employment action when the plaintiff was forced to vacate her private office and her work files "disappear[ed] under suspicious circumstances." 166 F.3d at 153. Despite it's ostensible support of plaintiff's case, however, the *Durham* Court's holding was based on unique facts: plaintiff's private office was a specific negotiated condition of her employment and her files were "vital to her work." *Id*. Plaintiff does not contend that her office was a negotiated condition of her employment, nor that it was essential to her job performance.   The same is true regarding the reassignment of her clients. The Court finds that these changes were merely incidental to her reassignment and do not constitute an adverse employment action.

In addition to the change in office and clients, Brown alleges that National Penn failed to give her an annual performance review for the first time since she was hired, thereby depriving her an opportunity to receive a raise. Pl. Resp. Opp'n Summ. J. 8. Viewing the evidence in the light most favorable to the Plaintiff, Brown's alleged failure to receive her annual performance review (and by extension the opportunity for a raise) may be actionable as an adverse employment action if found to be motivated by discriminatory animus. *See Dean v. Kraft Foods North America, Inc.*, No. Civ.A. 02-8609, 2005 WL 1793532, at *6 (E.D. Pa. Jul. 27, 2005) (evidence that plaintiff was the only employee who did not receive annual performance reviews and the corresponding opportunity for a salary increase was sufficient to prove past discrimination).   Nevertheless, Brown bears the burden of providing "evidence adequate to create an inference that [the] employment decision was based on an illegal discriminatory criterion." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (internal quotations omitted). More specifically, she must "establish some causal nexus between [her] membership in a protected class and the

[adverse employment action]." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003). "The central focus of the inquiry . . . is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Pivirotto v. Innovative Systems, Inc.,* 191 F.3d 344, 352 (3d Cir. 1999) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978)). While Brown has identified a single male comparator, Bachman, she fails to point to evidence regarding the timing of his performance review (or for that matter, any other employee's). Therefore, she has failed to establish a prima facie case of disparate treatment.

To the extent that Brown relies on her termination as adverse employment action to establish her disparate treatment claim, she once again fails to establish her prima facie case. While termination of employment certainly constitutes adverse employment action, *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001), Brown fails to establish any causal nexus between her gender and her termination. The only argument that Brown sets forth regarding disparate treatment in her termination relates to National Penn's failure "to provide one employee who had ever been discharged for filing their own insurance claim." Pl. Resp. Opp'n Summ. J. 8.  Put simply, Brown has failed to carry her burden of showing a prima facie case of disparate treatment. Therefore, the Court will grant Defendant summary judgment on Count I.

### Retaliation Claims

Title VII's anti-retaliation provision forbids an employer from discriminating against an employee for "oppos[ing] any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Under the PHRA, it is similarly unlawful for an employer "to discriminate in any manner against any individual because such individual

has opposed any practice forbidden by this act . . . ." 43 P.S. § 955(d). Brown alleges that National Penn violated these statutes by terminating her employment in retaliation for complaining about sexual discrimination. Compl. ¶19. National Penn claims she was terminated for breaching the company's Code of Conduct, (Def. Mot. Summ. J. 22), but Brown argues that this rationale is pretextual, Pl. Resp. Opp'n Summ. J. 10-12.

*McDonnell Douglas* governs retaliation claims brought under both Title VII and the PHRA. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997). To establish a prima facie case of retaliation, Brown must show "(1) that she engaged in protected activity [under the statute], (2) that the employer took adverse action against her, and (3) that a causal link exists between the protected activity and the employer's adverse action." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). While Brown's termination satisfies the second element, the record lacks sufficient evidence to establish that Brown engaged in any protected activity under either of the statutes and, ipso facto, that the adverse employment activity was causally related to protected activity. Thus, her prima facie case fails.

Protected activities under Title VII's anti-retaliation provision include formal charges of discrimination as well as "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). A formal letter of complaint to an employer or a commission such as the EEOC or PHRC is not necessary. *Id.* However, "opposition to an illegal employment practice must identify the employer and the [illegal] practice . . . ."

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (E.D. Pa. 2006).

"A general complaint of unfair treatment is insufficient to establish protected activity under

Title VII." *Barber v. CSX Distrib'n Servs.*, 68 F.3d 694, 702 (3d Cir. 1995).

 In *Barber*, the Third Circuit held that a letter to an employer's Human Resources

Department was not protected activity because it did not specifically complain about age

discrimination. *Id.* at 701-02.   Similarly, Brown's complaints cannot be considered

protected activity because she merely complained about being treated unfairly instead of

complaining specifically about gender discrimination. Although Plaintiff states she "told

Broemel that her demotion was unfair because of her gender," (Compl. ¶11), there is no

evidence in the record to indicate that Brown's gender was ever a topic of conversation

between the two. In her deposition, Brown recounts her conversation with Broemel as

follows:

> My recollection is that I wanted to know why John was taking over my office and why I wasn't told about it sooner, why you [Broemel] had to [announce the changes] at a meeting and embarrass me, and about the clients, the fact that they were – I'm sorry, that John was going to be handling the larger clients.

Brown Dep. 101:20-25.

 Two other references to Brown's conversation with Broemel appear in the record.

In her discharge questionnaire, Brown wrote: "I expressed my objection to my manager . . .

that I felt this demotion was unfair because John [Bachman] has less time on the job and

less experience and I was doing a great job with the larger clients." Brown Discharge

Questionnaire 7. Her responses to National Penn's interrogatories merely state, "I also told

[Broemel] it was unfair." Brown Interrog. ¶10. Such statements do not meet the standard

for protected activity.

Moreover, Brown testified in her deposition that, despite her objections to the reorganization, she never complained to anyone at National Penn that she believed she was discriminated against. Brown Dep. 108:6-8. In her affidavit, Broemel likewise states, "[a]t no point prior to her termination did Ms. Brown complain to me regarding unfair treatment on the basis of gender or any other protected classification . . . [nor] did Ms. Brown complain to me regarding any issues of alleged discrimination." Broemel Aff. ¶¶35-36. Without any evidence that her complaints to Broemel rose to the level of protected activity, Brown fails to make out a prima facie case for retaliation under Title VII and the PHRA. Therefore, summary judgment will be granted in defendant's favor.

<u>**CONCLUSION**</u>

In light of the foregoing, the Court will **GRANT** Defendant's motion for summary judgment, (Doc. No. 13), and enter **SUMMARY JUDGMENT** on Counts I and II.

**BY THE COURT:**

**/s/ C. Darnell Jones, II**

_____

**C. DARNELL JONES, II   J.**